PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUIS LICEA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>JOY ORGANICS LLC, a Colorado limited liability company, d/b/a www.joyorganics.com,<br><br>Defendant. | Case No. 5:26-cv-5782<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**1. Violation of California Penal Code § 631(a)**<br><br>**2. Violation of Title III of the Americans with Disabilities Act** |

Plaintiff Luis Licea ("Plaintiff") alleges against Defendant Joy Organics LLC ("Joy Organics" or "Defendant") as follows:

## I. NATURE OF THE ACTION

1. This is an individual action arising from two distinct but contemporaneous forms of unlawful digital conduct on Defendant's commercial website, www.joyorganics.com (the "Website"). ***First***, while Plaintiff was using the Website to shop for CBD products, Defendant caused third-party advertising, data-broker, identity-resolution, and behavioral-tracking technologies to intercept and acquire information about his communications and browsing activity. ***Second***, the Website contained serious accessibility barriers that prevented Plaintiff, who is legally blind and uses a screen reader, from independently navigating, selecting product options, confirming whether products were added to his cart, and completing a purchase.

2. The privacy violation is particularly stark because Defendant provides a specific "Your Privacy Choices" mechanism through which visitors may reject non-essential cookies, tracking, and data sharing. When that mechanism is used, the Website confirms that the browser has been opted out. Yet contemporaneous technical testing documented that multiple third parties continued to receive tracking communications and to store or use persistent identifiers after that rejection was registered.

3. The third parties identified in the testing include data brokers and advertising platforms whose business models depend upon recognizing users, synchronizing identifiers, building or enriching profiles, and using browsing behavior for advertising and audience targeting. The identified technologies included Throtle, Magnite, Teads, Xandr, Microsoft/Bing, AddShoppers/SafeOpt, and Eskimi.

4. These technologies are not merely passive libraries residing on Defendant's server. They operate through executable scripts, pixels, web beacons, network requests, cookie-sync calls, and remote endpoints that cause the visitor's browser to communicate directly with third-party servers while the visitor is interacting with the Website. The requests can communicate page and product views, identifiers, IP-address information,

device/browser information, cookie values, and other session data capable of being associated with a user or persistent advertising profile.

5. Plaintiff personally attempted to use the Website with JAWS 26 on a Dell laptop running Windows 11 and Google Chrome. Plaintiff was genuinely shopping for CBD products for his partner. During that visit he encountered unlabeled and poorly labeled graphics, ambiguous and redundant links, inaccessible tab controls, inaccessible product-option combo boxes, an add-to-cart interaction that produced no usable screen-reader feedback, and a cart link that he could not successfully use to complete the transaction.

6. These defects denied Plaintiff the same independent shopping experience available to sighted users. They deprived him of information conveyed visually, prevented him from reliably choosing product variants, prevented him from confirming the status of his shopping cart, and ultimately stopped him from purchasing a product he wanted to obtain for his partner.

7. Defendant publicly represents that it works toward conformance with WCAG 2.2 Level AA, the ADA, and Section 508, and that it uses automated and manual accessibility auditing and remediation. Those representations underscore that Defendant knows digital accessibility standards are necessary to provide blind users with effective access, yet the barriers Plaintiff encountered persisted on the live e-commerce Website.

## II. PARTIES

8. Plaintiff Luis Licea is a natural person and California resident. Plaintiff is legally blind. He cannot effectively use visual information on a computer screen and relies on screen-reading software to perceive, understand, navigate, and interact with websites. Plaintiff uses JAWS 26, a widely used screen reader that converts properly coded text and control information into synthesized speech and keyboard-accessible navigation.

9. Plaintiff is an experienced screen-reader user. He uses JAWS to read and write documents and email, to navigate the internet, to research products, and to shop

online. When websites are coded with meaningful alternative text, properly labeled controls, accessible names, logical focus behavior, functional keyboard interaction, and status announcements, Plaintiff can independently perform the same core tasks as sighted users.

10. Defendant Joy Organics, LLC is a Colorado limited liability company that owns, operates, controls, designs, maintains, and/or is responsible for www.joyorganics.com. Defendant sells CBD, hemp-derived, wellness, and related products to consumers throughout the United States, including consumers in California and within this District.

11. Defendant identifies its principal contact location as 2519 South Shields Street, Suite 1042, Fort Collins, Colorado 80526. Defendant conducts commercial transactions through the Website, offers customer accounts, subscriptions, rewards, customer support, product education, product search and selection, cart functionality, and checkout functionality through the Website, and deliberately serves California consumers.

12. Defendant also distributes Joy Organics products through physical retail partners and markets a wholesale program directed to brick-and-mortar businesses. The Website is an integral component of Defendant's retail sales and customer-service system and is used to present, describe, select, price, purchase, support, and facilitate access to the same branded goods that Defendant places into physical retail commerce.

## III. JURISDICTION AND VENUE

13. This Court has federal-question jurisdiction because Plaintiff asserts a claim under Title III of the Americans with Disabilities Act, a federal civil-rights statute.

14. This Court has supplemental jurisdiction over Plaintiff's California Penal Code section 631 claim because that claim forms part of the same case or controversy. Both claims arise from Plaintiff's use of the same Website, during the same course of online interaction, and concern the architecture and operation of Defendant's consumer-facing digital platform.

15. This Court has personal jurisdiction over Defendant because Defendant purposefully directs its commercial Website and sales activities to California consumers, sells and ships products into California, distributes products through California retail channels, collects information from California website visitors, and caused the digital conduct alleged here to occur when Plaintiff used the Website in California.

16. Venue is proper in the Central District of California because a substantial part of the events and omissions giving rise to the claims occurred in this District, including Plaintiff's use of the Website and the resulting denial of access and interception of communications.

## IV. FACTUAL ALLEGATIONS

### A. The Website Is a Commercial E-Commerce System Designed to Solicit and Complete Consumer Transactions

17. Joy Organics uses the Website as a principal point of contact with consumers. The Website presents products, prices, descriptions, product variants, educational information, customer-support functionality, cart and checkout functions, account and subscription features, privacy controls, and links to Defendant's policies and programs.

18. The requisite nexus exists between Defendant’s website and a physical place of public accommodation. Defendant Joy Organics maintains and operates a physical corporate facility at 2519 South Shields Street, Suite 1042, Fort Collins, Colorado 80526, an address Defendant itself publishes on its website as its business and contact address. The Website is not an independent or unrelated Internet enterprise; rather, it is an integrated extension of Defendant’s physical business operations and facilitates access to the goods and services offered by that business. Through the Website, consumers can research and select Defendant’s products, obtain product information, communicate with Defendant’s customer-service personnel, place orders for Defendant’s products, manage subscriptions, request refunds, and otherwise interact

with Defendant's business. Indeed, Defendant directs customers seeking assistance with products, orders, subscriptions, and refunds to the same website-based and customer-service infrastructure associated with its Fort Collins business address. Accordingly, barriers that prevent blind and visually impaired consumers from independently accessing and using the Website impede their ability to obtain and enjoy the goods, services, privileges, advantages, and accommodations of Defendant's physical business, establishing the required nexus between the challenged website and Defendant's physical place of public accommodation.

19. The Website invites users to browse and evaluate products, select flavors and strengths, add products to a cart, and purchase them. For blind consumers, each of those functions depends upon the Website exposing usable text alternatives, accessible names, semantic roles, keyboard-operable controls, programmatic state changes, and announcements that a screen reader can perceive.

20. Defendant has actual knowledge that accessibility is necessary. Its own Accessibility Statement states that Defendant aims to make joyorganics.com accessible and functional for everyone, works toward WCAG 2.2 AA and ADA conformance, uses automated and manual WCAG audits, remediates accessibility issues in development sprints, and engages in continuous monitoring.

21. Despite those representations, the live Website contained accessibility defects that prevented Plaintiff from independently completing an ordinary shopping transaction.

**B. Plaintiff's Visit**

22. Earlier this year, Plaintiff visited https://joyorganics.com/ using Google Chrome on his Dell laptop running Windows 11. JAWS 26 was active and was Plaintiff's means of perceiving the Website.

23. Plaintiff was not browsing aimlessly. He was shopping for CBD products for his partner and intended to locate and purchase a suitable product if he could use the Website successfully.

24. On the homepage, Plaintiff encountered graphics that JAWS announced only as "cloud-1 graphic," "cloud-2 graphic," "cloud-3 graphic," "cloud-4 graphic," and "banner image desktop graphic." Those names did not communicate the visual content, purpose, message, or function of the graphics. Plaintiff could not determine whether the images conveyed product information, promotional terms, navigational instructions, or other information material to his shopping decision.

25. Alternative text is the mechanism by which visual information is translated into information a screen reader can announce. When an image that conveys information or performs a function lacks meaningful alternative text, the blind user receives either a meaningless file-style label, an empty announcement, or no equivalent information at all.

26. Below a "Shop Sleep Gummies" link, Plaintiff encountered additional graphics with non-descriptive names rather than meaningful alternatives. This forced Plaintiff to proceed without knowing whether information visible to sighted shoppers was being withheld from him.

27. Below a "Shop THC" link, JAWS announced two tab controls only as "1 of 2 tab" and "2 of 2 tab." Those controls lacked accessible names sufficient to tell Plaintiff what content or function each tab represented.

28. Below a "Learn More" link, the Website exposed a series of tab controls that JAWS announced only by position: "1 of 4 tab," "2 of 4 tab," "3 of 4 tab," "4 of 4 tab," and then additional announcements extending through "10 of 4 tab." The contradictory positional information and absence of descriptive accessible names made the interface confusing and prevented Plaintiff from determining what each tab did or which information each tab controlled.

29. Near the main navigation region, Plaintiff encountered four links that JAWS announced identically as "link header menu." Repeating the same generic accessible name for separate navigation targets deprived Plaintiff of the information necessary to distinguish where each link would take him. A sighted user could use visual

placement, text, icons, and context; Plaintiff received only four indistinguishable announcements.

30. Plaintiff activated the link for "Shop Sleep Gummies" and then activated the "I am over 21" button. The next page continued to present unlabeled or poorly labeled tab controls that made product browsing difficult.

31. Plaintiff located a product described as "Organic THC-Free CBD Gummies (Strawberry Lemonade)." He was interested in the product and attempted to change the available flavor or variant through a control JAWS announced as a collapsed combo box associated with "strawberry lemonade 30 pack 10mg."

32. When Plaintiff attempted to operate that combo box, JAWS stopped providing usable speech feedback. The control did not expand in a way Plaintiff could perceive or operate, and he could not determine or select the available variants. This was a transaction-blocking accessibility defect because product selection depended on a visual control that did not expose usable keyboard or screen-reader behavior.

33. Plaintiff then navigated to the "Full Spectrum CBD Sleep Gummies with CBN & THC" product, which the Website displayed at approximately $39.96. Plaintiff wanted to purchase that product. The "mixed berry" variant control presented the same accessibility problem and could not be reliably operated with JAWS.

34. Plaintiff activated an "add to cart" button announced with a price of approximately $49.95. The Website did not provide a screen-reader-accessible status announcement confirming that an item had been added, did not move focus to a usable cart state, and did not otherwise inform Plaintiff what had occurred.

35. Because Plaintiff could not see the visual interface, silence after activating the add-to-cart control left him unable to determine whether the command succeeded, failed, or changed the page. A sighted user could visually inspect a cart badge, drawer, pop-up, subtotal, or other visual confirmation; Plaintiff received no equivalent information through JAWS.

36. Plaintiff then activated a cart link that JAWS exposed as a graphic link. The link did not provide a usable path to a functioning cart for Plaintiff. He remained unable to identify or access a cart containing the product he sought to buy.

37. Plaintiff continued to navigate but remained on the same shopping page and could not determine how to complete the purchase. The cumulative effect of the inaccessible variant selectors, ambiguous controls, missing accessible names, absent status feedback, and unusable cart functionality prevented him from independently buying the product.

38. Plaintiff stopped trying to complete the purchase because the barriers made further navigation futile and frustrating. He was disappointed because he wanted to obtain the CBD product for his partner but could not do so independently.

39. The barriers were not minor aesthetic defects. They affected the core functions of an e-commerce transaction: understanding promotional and product information, navigating among site sections, identifying controls, selecting a product variant, adding a product to the cart, confirming the cart state, and proceeding toward checkout.

**C. The Accessibility Defects Reflect Failures in Basic Screen-Reader Compatibility**

40. The missing or meaningless image descriptions prevent blind users from receiving information that is visually communicated through images and banners. Where an image is informational, it requires a meaningful text equivalent. Where an image functions as a control or link, its accessible name must communicate the control's purpose.

41. The repeated "header menu" links fail because different navigation destinations require distinguishable accessible names. A blind user navigating link-by-link cannot infer the destination from visual placement or iconography that JAWS cannot perceive.

42. The unnamed tab controls fail because a tab must expose both its role and an accessible name describing the content panel it controls. Positional announcements

alone do not tell a user whether a tab concerns ingredients, reviews, benefits, shipping, flavor, product information, or something else.

43. The contradictory tab-set announcements, including announcements extending beyond the stated total number of tabs, further impair orientation. A blind user depends on predictable role, name, state, and position information to understand component structure.

44. The product-variant combo boxes fail because an e-commerce selector must be operable by keyboard, must expose its expanded or collapsed state, must allow a screen-reader user to reach the available options, and must preserve usable speech and focus when the control is activated. A selector that silences or strands the screen reader effectively withholds the product choices from a blind customer.

45. The add-to-cart interaction fails because dynamic e-commerce actions must provide an accessible status change. If a visual cart count, drawer, toast, animation, or modal changes after activation, the same material information must be programmatically conveyed to assistive technology so the blind user knows the result of the command.

46. The cart-access failure is independently significant because the cart is the gateway to purchase. An inaccessible or broken cart link denies a blind shopper the ability to review selected items, quantities, prices, and the next step in checkout.

47. These defects are the types of barriers detected and evaluated through recognized accessibility testing processes such as WAVE and manual screen-reader testing. Plaintiff's direct JAWS experience establishes the real-world user impact: information and transaction controls that are available visually were not equivalently available through assistive technology.

**D. Plaintiff Is Deterred but Intends to Return**

48. Plaintiff remains interested in Joy Organics products and in purchasing CBD products for his partner. He would return to the Website to research products, select a suitable product, and complete a purchase if the barriers are removed.

49. Plaintiff is presently deterred from returning because he has no reason to believe that the barriers he personally encountered have been fully and permanently remediated. The Website is dynamic and Defendant can change products, scripts, components, and integrations without notice, making effective injunctive relief necessary to ensure continued accessibility.

50. Plaintiff does not seek preferential treatment. He seeks the same ability sighted customers have to understand product information, operate product controls, determine what is in the shopping cart, and complete a transaction independently.

**E. Defendant's Privacy-Choice Mechanism Expressly Permits Visitors to Reject Non-Essential Tracking**

51. Separate from the accessibility barriers, Defendant operates a privacy-choice system that expressly offers visitors the ability to opt out of non-essential cookies, tracking, and data sharing. The Website provides a "Your Privacy Choices" link in the footer.

52. Activating that link directs the visitor to a privacy-choice page where the visitor can opt out of non-essential cookies and data sharing. After the visitor activates the opt-out control and refreshes the page, the Website displays a confirmation that the browser on the device is opted out.

53. That affirmative confirmation communicates a clear and specific representation: Defendant has received the visitor's rejection and will honor it for the browser and device in use. At minimum, it establishes that the visitor has not consented to non-essential third-party behavioral tracking after the opt-out is registered.

54. Contemporaneous technical testing nevertheless documented third-party advertising and data-broker activity after the opt-out was successfully registered. The evidence was collected after rejection and showed remote communications, cookie synchronization, behavioral-tracking requests, and persistent third-party cookies associated with multiple external platforms.

**F. The Third-Party Surveillance Architecture**

55. Modern website tracking does not require a third party to sit physically between the user and the website. Defendant can embed third-party JavaScript, pixels, beacons, tags, SDK-like components, and remote calls into the Website. When the page loads or the user interacts with a product, those components instruct the user's browser to communicate with the third party directly.

56. The user's browser thereby becomes the transmission mechanism. It sends HTTP or HTTPS requests to remote domains selected by Defendant's implementation. Those requests can include the page being viewed, product or event information, referring information, cookie identifiers, advertising identifiers, device and browser attributes, IP-derived information, and parameters that enable one network to synchronize its identifier with another.

57. A pixel or web beacon is often functionally invisible to the visitor. Its purpose is not to display meaningful content. Instead, the request itself reports an event or page view to a remote service and permits the remote service to return or read identifiers that make subsequent recognition possible.

58. Cookie synchronization allows distinct advertising or data-broker systems to map different identifiers to the same browser or user profile. One platform may know a browser as identifier A, another as identifier B, and a synchronization event permits them to associate A and B so behavior observed across participating sites can be aggregated or used for advertising.

59. Persistent cookies extend the surveillance beyond a single page load. A cookie with a long expiration period allows the third party to recognize the same browser later, across future Website visits and, depending on the network, across other websites using the same technology.

60. The privacy-choice evidence identifies several distinct categories of third-party surveillance after rejection. Some are registered data brokers or identity-resolution services; others are advertising exchanges or programmatic advertising platforms;

others are cross-site marketing systems capable of associating browsing activity with known identity profiles.

**G. Throtle Continued Identity-Resolution and Cookie-Synchronization Activity After Opt-Out**

61. The testing identified communications to Throtle after the browser had been opted out. Throtle operates identity-resolution technology and is identified as a registered data broker.

62. Requests were sent to Throtle-controlled infrastructure using the thrtle.com domain for the purpose of synchronizing user cookie data with third-party advertising and data-broker platforms. The testing also documented third-party tracking-cookie storage associated with Throtle.

63. Identity resolution is materially different from a website merely serving its own page content. Its function is to connect browser, device, cookie, advertising, or other identifiers to a more persistent profile so that activity can be recognized, enriched, or used across contexts.

64. The continued Throtle activity after Defendant confirmed the opt-out is inconsistent with any claim that Plaintiff or similarly situated visitors consented to such non-essential identity synchronization.

**H. Magnite Continued Programmatic Advertising, Beaconing, and Long-Lived Tracking After Opt-Out**

65. The testing identified Magnite activity after opt-out. Magnite operates a programmatic advertising supply-side platform that facilitates automated advertising transactions and participates in cookie syncing and identifier matching across the advertising ecosystem.

66. A web beacon was sent to Magnite infrastructure to track visitors and synchronize cookie data with external platforms. The testing documented Magnite-associated tracking cookies capable of persisting for approximately 365 days.

67. A year-long identifier materially expands the privacy impact because it permits recognition far beyond the immediate Website session and can support the construction or enrichment of cross-site advertising profiles.

**I. Teads Collected Behavioral and Device-Identifying Information**

68. The Website also implemented Teads advertising technology. Teads uses scripts and advertising tags to collect device information, browsing behavior, interaction data, cookies, device identifiers, and IP-address information for advertising and profile-building purposes.

69. The testing documented a web-beacon request to Teads that reported browsing activity and enabled behavioral tracking. Teads-associated identifiers were capable of persisting for approximately one year.

70. The technical evidence further showed that Teads received IP and behavioral information upon site interaction. Even where subsequent tracking is limited after an opt-out, the initial interception and acquisition of behavioral information occurs at the moment the request is transmitted.

**J. Xandr Received Visitor-Activity and Identifier Data**

71. The testing identified Xandr, a Microsoft-owned advertising and data-aggregation platform that participates in real-time digital-advertising markets and cross-site audience profiling.

72. Requests were sent to Xandr-controlled adnxs.com infrastructure to track visitor activity on the Website, synchronize data with third-party platforms, collect IP-address information, and store or read third-party cookies.

73. Xandr-related cookies documented in the testing included identifiers associated with advertising and synchronization. Those identifiers enable a browser observed on joyorganics.com to be recognized by the Xandr advertising ecosystem outside the immediate transaction with Joy Organics.

**K. Microsoft/Bing Assigned and Used Persistent Browser Identification**

74. The Website also communicated with Microsoft/Bing advertising infrastructure. The testing documented requests that reported content viewed during the Website session and allowed Microsoft to associate that activity with a persistent browser identifier.

75. Microsoft uses the MUID, or Machine Unique Identifier, to recognize a web browser across websites and sessions for marketing and advertising purposes. The testing documented an MUID cookie with an approximately one-year lifespan.

76. For users logged into Microsoft services, the advertising profile may be capable of association with account information. For logged-out users, persistent pseudonymous identifiers still permit recognition across participating sites and can later be associated with account activity.

**L. AddShoppers/SafeOpt Received Product-View and Identity-Oriented Marketing Data**

77. The testing identified AddShoppers/SafeOpt, a cross-site marketing and identity-oriented advertising platform. The service is designed to associate website visitors with identity profiles and enable downstream marketing, including email targeting, based on browsing activity.

78. Requests to AddShoppers/SafeOpt infrastructure using shop.pe reported visitor behavior such as page or product views and user identifiers stored in cookie data. The testing also documented third-party cookies associated with the platform.

79. A technology designed to identify visitors and associate product-view behavior with an existing identity profile is not a neutral delivery service. Its commercial value depends on learning and using the substance and context of the visitor's interaction for marketing purposes.

### M. Eskimi Continued Behavioral Tracking and Third-Party Cookie Activity

80. The testing also identified Eskimi, a programmatic advertising and data platform that uses device identifiers, IP addresses, geolocation information, and browsing behavior to build advertising audiences and deliver targeted advertising.

81. Requests were sent to Eskimi infrastructure to behaviorally track Website visitors, and the testing documented third-party cookie storage associated with Eskimi after opt-out.

### N. The Intercepted Information Includes the Contents and Meaning of Plaintiff's Web Communications

82. Plaintiff's Website interactions are communications. When he requests a page, selects or views a particular product, activates a navigation path, interacts with a product variant, or attempts to add a specific product to his cart, his browser transmits information expressing the content and purpose of that interaction.

83. The third-party systems described above were implemented to learn and use those interactions, not merely to route packets. Product and page-view events communicate what Plaintiff was looking at; event parameters communicate what action he took; persistent identifiers permit those substantive events to be associated with the same browser or profile over time.

84. The tracking report specifically documents systems that receive or use page and product views, browsing behavior, content viewed during the session, and user identifiers. Those are substantive facts about Plaintiff's communications with the Website and are commercially valuable precisely because they reveal what the visitor sought, viewed, considered, or attempted to purchase.

85. The interception occurred contemporaneously with transmission. The Website caused the third-party code to execute and the remote requests to issue as the pages loaded and as visitor activity occurred. The third parties did not merely receive a historical record later created by Joy Organics; they received communications generated by the visitor's browser during the Website session.

**O. Plaintiff Did Not Consent to Third-Party Interception**

86. Plaintiff did not knowingly agree that third-party data brokers, advertising exchanges, identity-resolution vendors, or cross-site marketing companies could contemporaneously acquire the contents and meaning of his communications with Joy Organics.

87. To the extent Defendant contends that a privacy policy or cookie policy supplied generalized disclosure, such a passive policy does not establish Plaintiff's actual consent to the specific third-party interceptions alleged here, particularly where Defendant simultaneously offered a privacy-control mechanism that allowed the browser to reject non-essential tracking.

88. The explicit opt-out mechanism confirms the absence of consent after rejection. Defendant's system represented that the browser was opted out, yet third-party surveillance activity persisted. A company cannot reasonably characterize post-rejection tracking as consensual when its own interface records and confirms the opposite instruction.

**P. The Third Parties Acted for Their Own Independent Commercial Purposes**

89. The identified third parties were not merely acting as passive conduits for Joy Organics. They operate independent advertising, data-broker, identity-resolution, audience, and cross-site marketing businesses and use acquired identifiers and behavior to support their own networks, matching systems, advertising services, and profile infrastructure.

90. The third parties benefit independently from receiving Website visitor data because the data improves their ability to identify browsers, map identifiers, construct or enrich audience segments, attribute advertising activity, target ads, and recognize users across participating websites and platforms.

91. Defendant selected or permitted the code that enabled those communications and thereby aided, agreed with, employed, or conspired with the third-party recipients to acquire Website communications in real time.

### Q. Plaintiff's Privacy Injury

92. Plaintiff suffered a concrete privacy invasion when third parties were permitted to learn and retain information about his private browsing communications with Defendant without his consent. The injury is the loss of control and confidentiality over communications that Plaintiff directed to a commercial website for the limited purpose of evaluating and purchasing products.

93. The use of long-lived identifiers, identity-resolution systems, cookie synchronization, and cross-site marketing technology increases the intrusion because it makes the intercepted behavior capable of being tied to a persistent browser or user profile and used outside the isolated interaction with Joy Organics.

94. The privacy injury is independent of any later economic loss. The interception and acquisition itself deprived Plaintiff of control over who learned his browsing communications and exposed those communications to entities with whom he had no direct relationship.

## V. CAUSE OF ACTION

### FIRST CAUSE OF ACTION

### Violation of California Penal Code § 631(a)

95. Plaintiff incorporates the preceding allegations as though fully set forth herein.

96. California Penal Code section 631 protects against unauthorized interception, reading, learning, use, and assistance in the acquisition of communications while they are in transit or being sent or received.

97. Plaintiff used the Website to send and receive electronic communications concerning the products he viewed, the pages he requested, the controls he activated, the product variants he attempted to select, and the items he attempted to add to his cart.

98. Defendant intentionally caused third-party tracking code, pixels, beacons, scripts, remote calls, cookies, and identifier-synchronization mechanisms to execute

within Plaintiff's browser while those communications were in transit and contemporaneously being sent and received.

99. The third parties thereby read, attempted to read, learned, attempted to learn, intercepted, acquired, and/or used the contents and meaning of Plaintiff's Website communications, including page and product-view activity and associated behavioral information.

100. Defendant also aided, agreed with, employed, and/or enabled the third parties by embedding, configuring, permitting, or maintaining the code and integrations necessary for the third-party acquisition to occur.

101. The interception was intentional. The identified technologies do not appear on the Website by accident. They require implementation, configuration, tagging, endpoints, cookies, event definitions, or other deliberate technical deployment to communicate with the third parties.

102. Plaintiff did not consent to the third-party interception. Defendant's own privacy-choice mechanism permitted rejection of non-essential tracking and confirmed the opt-out. The continued activity after that rejection negates any contention that the relevant interception was authorized by Plaintiff.

103. The third-party recipients acted for independent commercial purposes, including identity resolution, cookie synchronization, audience development, behavioral advertising, cross-site recognition, marketing attribution, and targeted advertising. Their independent acquisition and use of Plaintiff's behavioral communications places them outside any claim that they were simply the intended recipient of Plaintiff's communications with Joy Organics.

104. As a direct and proximate result, Plaintiff suffered an invasion of his legally protected privacy interests and loss of control over private communications and behavioral information transmitted during his Website session.

105. Plaintiff seeks all statutory, actual, injunctive, equitable, and other relief available for the violations alleged, including the remedies authorized for unlawful interception and use of

**SECOND CAUSE OF ACTION**

**Violation of Title III of the Americans with Disabilities Act**

106. Plaintiff incorporates the preceding allegations as though fully set forth herein.

107. Plaintiff is an individual with a disability because he is legally blind and substantially limited in the major life activity of seeing. He requires screen-reading software to access visual information and interact with websites.

108. Defendant operates a commercial retail business that offers goods and services to the public. The Website is an integral service, privilege, and advantage of Defendant's retail operations and product-distribution system and is used to provide product information, product selection, purchasing, customer service, account management, rewards, subscription, and other retail functions.

109. Defendant sells Joy Organics goods through physical retail channels and partnerships and uses the Website to support and facilitate access to its branded goods, retail relationships, customer service, and commercial offerings. The Website is therefore not detached from physical commerce; it is a principal mechanism through which consumers access, evaluate, and transact for Defendant's goods and services.

110. Title III requires Defendant to afford individuals with disabilities the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations it makes available to the public and to provide reasonable modifications and auxiliary aids and services when necessary to ensure effective communication and equal access.

111. Defendant denied Plaintiff full and equal access because the Website failed to provide meaningful text alternatives for informational graphics, failed to provide descriptive names for distinct links and tabs, exposed confusing or contradictory tab

semantics, provided product-variant combo boxes that were not reliably operable with JAWS, failed to provide usable screen-reader feedback after add-to-cart activation, and failed to provide a functioning and understandable path to the shopping cart.

112. These barriers prevented Plaintiff from independently obtaining information and completing the same retail transaction a sighted customer could complete visually. Plaintiff could not determine the meaning of material graphics, distinguish navigation destinations, understand tab functions, choose product variants, confirm whether an item had been added to the cart, reliably access the cart, or complete his intended purchase.

113. The barriers are readily addressable through established web-development practices, including meaningful alternative text, accessible names, semantic roles and states, keyboard-operable controls, predictable focus handling, live-region or equivalent status announcements, and accessible cart and checkout components.

114. Defendant has acknowledged the relevance of WCAG 2.2 AA and represents that it uses accessibility auditing and remediation. Accordingly, remediation is both technologically feasible and within Defendant's own stated accessibility program.

115. Plaintiff was deterred from completing his purchase and from returning to the Website because of the barriers. He intends to return when the Website is made accessible so he can independently shop for Joy Organics products, including products for his partner.

116. Without injunctive relief, Plaintiff faces a real and immediate threat of repeated discrimination because the barriers can persist or recur as Defendant modifies its e-commerce components, third-party integrations, product pages, and dynamic interface.

117. Plaintiff seeks an injunction requiring Defendant to remove the barriers that denied him access and to maintain the Website in a condition that provides blind screen-

reader users full and equal access to its e-commerce functions, together with reasonable attorneys' fees, costs, and all other relief available under Title III.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

a. Declaring that Defendant violated California Penal Code section 631(a) as alleged;
b. Awarding Plaintiff all statutory and actual damages available under California law;
c. Enjoining Defendant from causing third-party advertising, identity-resolution, data-broker, and cross-site marketing technologies to intercept or acquire Plaintiff's Website communications without legally sufficient consent, including after a visitor has exercised Defendant's opt-out mechanism;
d. Declaring that the accessibility barriers alleged deny Plaintiff full and equal access to Defendant's goods and services in violation of Title III of the ADA;
e. Entering a permanent injunction requiring Defendant to remediate the Website so that blind consumers using screen readers can independently perceive Website content, navigate among controls, select product options, receive status updates, access the shopping cart, and complete e-commerce transactions, and requiring Defendant to maintain accessibility as the Website changes;
f. Awarding Plaintiff reasonable attorneys' fees, litigation expenses, and costs as authorized by law;
g. Awarding pre-judgment and post-judgment interest to the extent permitted by law; and

/ / /

/ / /

/ / /

h. Granting such other and further relief as the Court deems just and proper.

Dated: September 30, 2026

PACIFIC TRIAL ATTORNEYS, APC

By: */s/ Scott J. Ferrell*
Scott J. Ferrell
Attorneys for Plaintiff